## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 21-mj-115 |
| EMANUEL JACKSON, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In connection with the government's motion for pretrial detention of defendant Emanuel Jackson, who is charged with both felony and Class A misdemeanor violations for his conduct on January 6, 2021, as part of the mob that violently breached the restrictions surrounding the Capitol during the Joint Session of Congress convened to count electoral college votes from the 2020 Presidential election, the government submitted to the magistrate judge and to this Court, unsealed, a total of five video clips of varying lengths and sources showing images of defendant on that day ("Video Exhibits"). Gov't's Opp'n Def.'s Rev. Mot. ("Gov't's Opp'n"), Exs. 1–5. NBC Washington News requested access to the Video Exhibits in a letter, which was docketed, pursuant to LCrR 17.2(c) and LCrR 57.6, *see* Court's Notice, ECF No. 16, to give the parties an opportunity to respond, Min. Order (Feb. 26, 2021). While the government takes no position on releasing the Video Exhibits to the media, Gov't's Resp. to Court's Feb. 26, 2021 Min. Order ("Gov't's Resp.") at 2, ECF No. 20 (stating "government would submit to the Court's discretion regarding providing the exhibits to NBC News"), defendant objects and seeks to seal this evidence, Def.'s Response to Court and Motion to Seal ("Def.'s Mot. Seal") at 2, ECF No. 19.

For the reasons set out below, defendant's Motion to Seal is **DENIED** and NBC News' request for access to the Video Exhibits is **GRANTED**.

1

I.      BACKGROUND

Defendant Emanuel Jackson turned himself in to the Federal Bureau of Investigation ("FBI") and was charged, on January 19, 2021, in a criminal complaint with assaulting an officer of the United States and doing so with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 111(a) and (b), obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), unlawful entry and physical violence on restricted building or grounds, in violation of 18 U.S.C. §§ 1752(a) and (b), and violent entry and disorderly conduct on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2).  Compl. at 1, ECF No. 1.  These charges stemmed from defendant's participation in the assault on the United States Capitol building on January 6, 2021, which disrupted for several hours the certification of the vote count of the Electoral College for the 2020 Presidential Election.  Compl., Attach. 1, Aff. at 1, ECF No. 1-1.

Defendant was detained at his initial appearance, on January 19, 2021, in this District, Minute Entry (Jan. 19, 2021), and, at a subsequent detention hearing, on January 22, 2021, the magistrate judge granted the government's motion for pretrial detention, Min. Entry (Jan. 22, 2021); Order of Detention Pending Trial, ECF No. 13.  At the detention hearing, the government submitted the Video Exhibits, which "were played during the detention hearing."  Gov't's Resp. at 1 n.1 (citing Magistrate Judge Detention Hr'g Tr. (Jan. 22, 2021) ("MJ Hr'g"), ECF No. 9). The five Video Exhibits—two from security cameras inside the Capitol building, one from a police officer's body-worn camera, and two from public online sources—are briefly described below.

Video Exhibit 1, with the timestamp January 6, 2021 at 2:47 PM from a U.S. Capitol security camera, is silent and 55 seconds in length, showing U.S. Capitol Police officers forming

a line in a Capitol building entryway to block entry to a large crowd of rioters. *See* Gov't's Opp'n, Ex. 1. At various points in the video, defendant is visible at the front of the crowd of rioters jabbing a closed fist downward onto the helmet of one of the officers and, after the mob heaves against the police line and successfully pushes into the Capitol building, defendant is visible pushing an officer hard enough to dislodge the officer's helmet.

Video Exhibit 2, without a timestamp from a different U.S. Capitol security camera, is silent and 22 seconds in length, showing a Capitol building doorway from behind a police line. *See* Gov't's Opp'n, Ex. 2. Defendant is again visible, this time using a black, metal baseball bat to strike repeatedly at police officers, hitting the officers' raised plastic shields, while another rioter next to defendant similarly swings at the police with a helmet.

Video Exhibit 3, with a timestamp of January 6, 2021 at 4:49 PM from a police officer's body-worn camera, is 48 seconds, with sound. *See* Gov't's Opp'n, Ex. 3. Initially, many different rioters are seen throwing objects at the police line and striking at police shields, and then defendant is visible using the baseball bat repeatedly to strike the officers' police shields.

Video Exhibit 4, without a timestamp and obtained from Getty Images, is 83 seconds in length, taken from the side of a doorway the rioters are trying to breach. *See* Gov't's Opp'n, Ex. 4. Defendant is visible in this video clip holding the baseball bat in a large crowd of rioters, and then retreating from the doorway, possibly due to pepper spray, droplets of which are seen in the air. While defendant does not approach the doorway again during the clip, he is seen alternately yelling along with the crowd and excitedly observing his surroundings.

Video Exhibit 5, without a timestamp and obtained from a social media post by "@meldcole," is 66 seconds in length, and captioned "'I'm not here for Trump, I'm here for America' says the 19 year old who didn't vote in last year's election." Gov't's Opp'n, Ex. 5.

This video clip shows defendant on the Capitol grounds responding to questions from a person

off-camera.  Defendant appears to have difficulty understanding certain questions posed, but

when asked what happened, defendant admits he had a bat and was pepper sprayed "in the eye,"

often repeating himself.  When "asked why he is there," defendant responds that he is "fighting

for America," that he feels "we are being taken over by globalists, the Chinese," that he is "here

for America."  When asked his age and whether he voted in the last election, defendant states

that he is nineteen and did not vote because he thought his vote "didn't count," but that he

"learned the lesson" and "will vote next in the midterms."  The first comment posted about the

video, by "@stretcharmstrong," remarks "My man seems a little unwell, aside from the physical

pain.  That's just my superficial reading."

A month after entry of the pretrial detention order, defendant sought review and release

on conditions.  *See* Def.'s Mot. Review and Revocation of a Detention Order ("Def.'s Mot.

Rev."), ECF No. 10.  As support, defendant filed two exhibits, under seal.  The first defense

exhibit, an expert neuropsychology evaluation, dated June 2020 and conducted pre-litigation "in

order to determine [defendant's] need for disability services," *see* Def.'s Mot. Rev., Ex. A,

Abbreviated Evaluation by Salya Namazi, Ph.D. ("Expert Evaluation"), ECF No. 11, details

defendant's diagnosis with autism spectrum disorder, an intellectual disability and a language

disorder, noting his intellectual processing speed is in the first percentile out of 100 and his IQ is

in the fifth percentile out of 100, *id.* at 2, contributing to defendant's language skills "range from

a ten- to eleven- year old level," that "he does not have sufficient ability to independently

manage the basic language and literacy demands of life in a complex society," that he "lacks

sufficient ability to make responsible decisions for himself," *id.* at 5, and that he is at high risk

for "manipulation and being taken advantage of by others," *id.* at 6.  The second defense exhibit

is a letter verifying defendant's residency at an extended transitional housing program for homeless youth, *see* Def.'s Mot. Rev., Ex. B, Letter from Roxanne Murray, Project Director, Echelon Community Servs. (Feb. 17, 2021), ECF No. 11-1, which program, defense counsel represents, will "welcome [defendant] back . . . with open arms," Rough Hr'g Tr. at 9:7–9: (Feb. 25, 2021) ("Hr'g Tr. (Feb. 25)"), and will be able to "monitor [defendant's]" compliance with court-imposed release conditions, *id*. at 13:7–13:13.

In opposing defendant's motion for review of the pretrial detention order, the government submitted, unsealed, to the Court and defense counsel, the same five Video Exhibits previously shown at the detention hearing before the magistrate judge.  Gov't Opp'n at 5 n.1; *see id.*, Exs. 1–5.

At the hearing, on February 25, 2021, to review the magistrate judge's pretrial detention order, defendant supplemented the submitted expert report about defendant's mental disabilities with the testimony of a licensed clinical psychologist.  *See* Hr'g Tr. (Feb. 25), 2:25–3:5.  While acknowledging the "indisputably dangerous" nature of defendant's conduct depicted in the Video Exhibits, *id.* at 7:3–7:5, defense counsel pointed out that (1) defendant had no prior criminal history, as this was his "first arrest [and] he has no history of violent behavior," Def.'s Mot. Rev. at 3; (2) defendant "is not a member of any anti-government, hate, or militia-style groups," *id*.; (3) defendant has a severe intellectual disability, autism spectrum disorder, *id.* at 7:25–8:3; *id.* at 9:18–10:6; (4) defendant "owns no cell phone and is not alleged to have communicated with any other attendees, before, during, or after the rally," Def.'s Mot. Rev. at 3; and (5) defendant turned himself in to the FBI, which otherwise had not even identified him as the person depicted in the videos; indeed, after FBI agents "[defendant] initially encountered outside of the building repeatedly told him that there was no warrant for

his arrest," he actually showed "the agents the FBI flyer on social media," at which point he was taken into custody, *id.*

Highlighting the special circumstances of defendant's mental condition, defense counsel described defendant's offense conduct as an isolated incident caused by the confluence of his unique disability and the overwhelming social nature of the riot defendant found himself pulled into. *See* Hr'g Tr. (Feb. 25) at 10:7–10:20; 11:23–11:25. To bolster this point, defendant's expert clinical psychologist testified that individuals with autism, like defendant, struggle to "learn[ social] . . . rules, particularly rules about social behavior," *id.* at 27:22–27:24, and so are prone to "mirror[ing] the behavior of the people around them," for lack of alternative or internal guidance, *id.* 29:4–29:7. At the same time, they often exhibit "rigidity" and will "follow a rule . . . [or] what they believe to be a rule in a way that is so inflexible that, at times, it is a problem." *Id.* at 27:20–27:22. Individuals with autism are able and motivated to follow rules that are "clear" and "explicit," *id.* 27:25–28:2, such that defendant's compliance with conditions of release was reasonably assured, Rough Hr'g Tr. at 14:10–16:4 (Mar. 2, 2021) ("Hr'g Tr. (Mar. 2)").

In response, the government argued pretrial detention was required because defendant was dangerous, as the Video Exhibits showed him "attack[ing]" police officers, Hr'g Tr. (Feb. 25) at 22:11, at the front line of the mob assault on the Capitol building using an aluminum baseball bat, *id.* at 22:20–22:21, and defendant continued to "affirmatively attack[]" the officers, *id.* at 23:10–23:14, without provocation, *id.* at 33:25.

Defendant's motion for pretrial release was granted and defendant was released to home detention, with GPS location monitoring and other conditions of the High Intensity Supervision Program (HISP). *See* Min. Entry (Mar. 2, 2021); Order Setting Conditions of Release at 2, ECF

No. 17.[1]  Citing defendant's self-identification to the FBI, Hr'g Tr. (Mar. 2) at 11:10–11:13, the severity of defendant's mental incapacity and the degree to which this condition makes him "easily manipulated and susceptible to what's going on around him," *id.* at 12:5–12:16, his lack of a criminal record or history of violence, *id.* at 13:14–13:16, his close family and community ties to Washington, D.C., *id.* at 13:17–13:19, his housing instability and family circumstances, *id.* at 13:5–13:13, and the availability of a third-party custodian at his transitional housing for homeless youth to ensure defendant's understanding of and compliance with court-ordered release conditions, *id.* 15:21–16:4, the Court determined that the danger defendant posed could be reasonably mitigated by a combination of conditions to reasonably assure the safety of other persons and the community, *see* 18 U.S.C. § 3142(f).  The reasoning behind the release determination turned heavily on defendant's intellectual disabilities, which served to explain how a young person without a criminal record of any kind or history of any violence and generally considered to be "exceedingly polite, likeable, and hardworking," Expert Evaluation at 2, would "out of nowhere . . . join[] this riot on January 6th," Hr'g Tr. (Mar. 2) at 14:22–15:2.

On February 26, 2021, NBC Washington News submitted a letter to the Court seeking immediate access to the government's Video Exhibits.  *See* Court's Not. (Feb. 26, 2021).  Having received the parties' positions, this media request is ripe for resolution.

---

[1]     Aware that, in another case, *United States v. Leffingwell*, in which the defendant was charged with assaulting a police officer inside the Capitol by pushing and striking the officer repeatedly in the helmet and chest with his fists, Compl., Attach. 1, Aff. at 1, *United States v. Leffingwell*, Case No. 21-cr-05 (ABJ) (D.D.C. Jan. 7, 2021), ECF No. 1-1, the government had agreed to pretrial release due to that defendant suffering from memory loss, *see* Pretrial Services Report ("PSR"), *Leffingwell*, Case No. 21-cr-05 (ABJ) (D.D.C. Jan. 8, 2021), ECF No. 4 (reporting that Leffingwell could not recall his address when asked where he lived); Min. Order (Jan. 8, 2021), *Leffingwell*, Case No. 21-cr-05 (ABJ) (D.D.C. Jan. 8, 2021) (documenting government raising no objection to Leffingwell's pretrial release with conditions), the Court continued the hearing briefly, from February 25 to March 2, 2021, to give the parties an opportunity to reach a resolution on pretrial release.

## II.     DISCUSSION

Defendant opposes release of the Video Exhibits to the media on grounds that this evidence may be grand jury material and implicates defendant's "constitutionally protected interest" in "[f]undamental [f]airness," Def.'s Mot. Seal at 2, and instead seeks to have these exhibits placed under seal, *id.*  The government disagrees with defendant's reasons for sealing, denying "that the exhibits are grand jury material or that the defendant has a constitutionally protected interest," Gov't's Resp. at 2, yet otherwise takes no position on providing public access to this evidence, *id.*  Neither party addresses whether the Video Exhibits qualify as judicial records, the applicable legal principles governing public access to judicial records, or how those principles apply to the Video Exhibits at issue here.  These issues relevant to resolving the media request for access and defendant's sealing motion are addressed *seriatim*.

### A.     Video Exhibits Are Judicial Records

At the outset, the Video Exhibits are judicial records.  The D.C. Circuit has "previously explained, 'not all documents filed with courts are judicial records.'"  *Leopold v. United States*, 964 F.3d 1121, 1128 (D.C. Cir. 2020) (quoting *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3  (D.C. Cir. 2013)); *see also Am. Int'l Grp.*, 712 F.3d at 4 (finding consultant reports were not judicial records because district court "made no decisions about them or that otherwise relied on them"); *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997) (finding plea agreement that played no role in any adjudicatory function was not judicial record).  Instead, "whether something is a judicial record depends on 'the role it plays in the adjudicatory process.'"  *Leopold*, 964 F.3d at 1128 (quoting *Am. Int'l Grp.*, 712 F.3d at 3 (quoting *El-Sayegh*, 131 F.3d at 163)).  Documents and other materials filed in court "intended to influence the court," *Leopold*, 964 F.3d at 1128, are judicial records.  *See, e.g., id.* at 1129 (finding sealed

orders, applications for orders and supporting documents in criminal investigation matters, and court dockets for these records, are judicial records); *League of Women Voters v. Newby*, 963 F.3d 130, 136 (D.C. Cir. 2020) (finding that "every part of every brief filed to influence a judicial decision qualifies as a 'judicial record'"); *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 668 (D.C. Cir. 2017) (holding that appellate briefs and appendices are judicial records because they are "intended to influence" the court and the court "ma[kes] decisions about them.").[2]

Here, the Video Exhibits were submitted to the magistrate judge and to this Court as attachments to the government's brief to "influence a judicial decision," under the Bail Reform Act, 18 U.S.C. § 3142, whether to detain or release defendant pending trial, *see* Gov't's Opp'n at 5 n.1; *Newby*, 963 F.3d at 136. The exhibits played a significant and meaningful role in the adjudicatory process, with extensive discussion of these exhibits in the government's briefing, *see* Gov't's Opp'n at 5–6, 8–9, showing of the Video Exhibits at the detention hearing before the magistrate judge, MJ Hr'g Tr. 3:25–4:13, 31:10–31:18, and close review of these exhibits by this Court in considering whether defendant posed a danger to the community warranting pretrial detention, Hr'g Tr. (Mar. 2) at 11:5–11:9, 12:22–13:4.[3]

---

[2]      Other Circuits also use this broad definition of judicial records to extend "not only to items in evidence, but rather more generally to 'materials on which a court relied in determining the litigant's substantive rights,' which may include 'transcripts of proceedings [and] everything in the record, including items not admitted into evidence.'" *United States v. Graham*, 257 F.3d 143, 152 (2d Cir. 2001) (quoting *Smith v. United States Dist. Ct.*, 956 F.2d 647, 650 (7th Cir. 1992) and citing *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 40, 408 (1st Cir. 1987)). In *Graham*, the Second Circuit held that video and audio recordings played at a pre-trial detention hearing but not introduced into evidence as exhibits were nonetheless judicial documents subject to the presumption of public access, explaining that "the definition of a 'judicial document' . . . extend[s] to any material presented in a public session of court 'relevant to the performance of the judicial function and useful in the judicial process' whether or not it was formally admitted." 257 F.3d at 153 (quoting *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995)).

[3]      The fact that the Video Exhibits are not filed on the public docket has no bearing on whether they are judicial records, since they are not in a format amenable to filing on the Court's Case Management/Electronic Filing (CM/ECF) system.

This finding that the Video Exhibits are judicial records triggers a "strong presumption in favor of public access."  *Leopold,* 964 F.3d at 1127 (quoting *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion) (explaining that right of access "contributes to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system"); *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents…"); *MetLife*, 865 F.3d at 674 (recognizing "the longstanding common-law right of public access to judicial records -- a right that 'antedates the Constitution'") (quoting *El-Sayegh*, 131 F.3d at 161).  This common law "right to inspect and copy judicial records is not absolute," *Nixon*, 435 U.S. at 598, and "may be outweighed by competing interests," *Leopold,* 964 F.3d at 1127, as discussed next.

## B.  Presumptive Public Access to Judicial Records

The Supreme Court has instructed, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."  *Nixon*, 435 U.S. at 599.  The competing interests that may overcome the presumption favoring public access to judicial records have been "crafted [] into a six-factor test" originating in *Hubbard*.  *Leopold*, 964 F.3d at 1127; *id*. at 1131 n.9 (noting that the *Hubbard* factors are what "a court should weigh in ruling on a motion to seal or unseal a judicial record" (citing *MetLife*, 865 F.3d at 665; *Hardaway v. D.C. Housing Auth.*, 843 F.3d 973, 980, (D.C. Cir. 2016); *Primas v. District of Columbia*, 719 F.3d 693, 698–99 (D.C. Cir. 2013); *In re Sealed Case*, 237 F.3d 657, 666 (D.C. Cir. 2001); *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996); *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d

1268, 1277 (D.C. Cir. 1991)).  The *Hubbard* six-factor test "has consistently served as our

lodestar" by "ensur[ing] that we fully account for the various public and private interests at

stake," *Metlife*, 865 F.3d at 666, in evaluating motions to seal or to unseal and provide public

access to judicial records.

> The *Hubbard* test considers:
>
> "(1) the need for public access to the documents at issue; (2) the extent of
> previous public access to the documents; (3) the fact that someone has objected to
> disclosure, and the identity of that person; (4) the strength of any property and
> privacy interests asserted; (5) the possibility of prejudice to those opposing
> disclosure; and (6) the purposes for which the documents were introduced during
> the judicial proceedings."

*Leopold*, 964 F.3d at 1131 (quoting *Metlife*, 865 F.3d at 665); *see also id.* at 1129–30 (D.C. Cir.

2020) (explaining that unless "Congress has spoken directly to the issue at hand," the "common-

law standard enshrined in the *Hubbard* balancing test" governs "[]sealing decisions" (internal

quotation marks omitted) (quoting *Metlife*, 865 F.3d at 669)); *Hubbard*, 650 F.2d at 317–22.

### C.    Application of Hubbard Factors

On balance, consideration of the *Hubbard* factors demonstrates that the arguments raised

in defendant's motion to seal are insufficient to overcome the strong presumption of public

access to the government's Video Exhibits.

#### 1.   *Need for Public Access to Video Exhibits*

"[T]he fact that the exhibits . . . were referenced in the [government's] public filings may

create a public need for them."  *Nat'l Children's Ctr.*, 98 F.3d at 1410–11; *see also Hubbard*,

650 F.2d at 318 (finding that documents "specifically referred to in the trial judge's public

decision" creates a public need for those documents).  Media applications to inspect and copy

video exhibits have been granted where the exhibits raise "issues of major public importance

related to the conduct not only of the defendant[] but also of government law enforcement agents." *In re Appl. Nat'l Broad. Co.*, 653 F.2d 609, 620–21 (D.C. Cir. 1981).

NBC Washington News requested the Video Exhibits precisely because this evidence reflects real-time images of the assault on the Capitol building on January 6, 2021 and this effort to disrupt the democratic process in counting electoral votes for the peaceful transition of Executive Branch power to the newly elected President.  This violent challenge to a constitutionally mandated process is of deep national importance and public interest both as to the offense conduct and individuals involved, and the efforts of federal law enforcement agents, prosecutors and the courts in handling the cases arising out the events on January 6th.  Releasing the exhibits would ensure the public is able to "keep a watchful eye on the workings of public agencies" and the courts through the news outlet's "intention to publish information concerning the operation of government."  *Nixon*, 435 U.S. at 598 (citations omitted).  This factor weighs heavily in favor of public access.

### 2.   *Extent of Previous Public Access to Video Exhibits*

 "[P]revious access has been considered relevant to a determination whether more liberal access should be granted to materials formerly properly accessible only on a limited basis through legitimate public channels and to a determination [of] whether further dissemination of already accessible materials can be restrained."  *Hubbard*, 650 F.2d at 318.  As to Video Exhibits 4 and 5, which were retrieved, respectively, from Getty Images and Instagram, a social media application, *see* Gov't's Opp'n, Exs. 4–5, the images are already readily accessible on the internet and thus sealing of these exhibits in this case is both pointless and unwarranted.

By contrast, Video Exhibits 1 and 2, from security cameras inside the Capitol building, and Video Exhibit 3, a video clip from a police officer's body-worn camera, have not been made

available online.  Nevertheless, Video Exhibit 1 was publicly shown at the magistrate judge

detention hearing, *see* MJ Hr'g at 4:23–5:19, 11:8–11:24, a screenshot from Video Exhibit 3 was

included in the publicly-available criminal complaint, *see* Aff. at 3, and Video Exhibit 2 depicts

substantially the same conduct as Video Exhibit 3, merely from a different angle.  While release

to the media of the full video clips in exhibits 1, 2 and 3, would allow more access than

previously provided in excerpted screenshots curated by the government, those screenshots

depict defendant's most egregious conduct and therefore has already been made publicly

accessible.  Further context for these already disclosed screenshots that shows the criminal acts

while occurring in this matter of national importance provides valuable information of public

interest.  *See In re Appl. Nat'l Broad. Co.*, 635 F.2d 945, 952 (2d Cir. 1980) (noting, in

ABSCAM public corruption criminal prosecutions, that "[t]hough the transcripts of the

videotapes [showing bribe payments to public officials] have already provided the public with an

opportunity to know what words were spoken, there remains a legitimate and important interest

in affording members of the public their own opportunity to see and hear evidence that records

the activities of a Member of Congress and local elected officials, as well as agents of the

Federal Bureau of Investigation.").  Thus, the second factor favors release of all the Video

Exhibits.

### 3.  *Identity of Person Objecting to Disclosure*

The third *Hubbard* factor provides broader protection from disclosure "where a third

party's property and privacy rights are at issue [and] the need for minimizing intrusion is

especially great . . . ."  *Hubbard*, 650 F.2d at 319.  As the D.C. Circuit explained, "the fact that

objection to access is made by a third party weighs in favor of non-disclosure."  *Id*.  The only

party to object here is the defendant, not any third party, favors disclosure.

### 4. & 5. Strength of Defendant's Asserted Privacy Interests *and* Possibility of Prejudice

The fourth and fifth *Hubbard* factors are considered together since, here, defendant's privacy and prejudice-related interests are the basis for his objection to disclosure and request for sealing. As noted, defendant objects to disclosure of the Video Exhibits, arguing, first, that the exhibits "are part of a *potential* grand jury investigation," Def.'s Mot. Seal at 2, and, consequently, making this evidence publicly available could result in "potential destruction of mitigating evidence and the safety of potential witnesses . . . alert other individuals who are subjects of an investigation of the existence and the extent of Mr. Jackson's involvement, and [] might alert individuals to methods being used by law enforcement," *id.*, and thereby "could prejudice an investigation, compromise the fairness of a grand jury, and endanger the safety of Mr. Jackson, law enforcement agents, or other potential witnesses," *id.* The government disagrees with this asserted harm and makes no claim that the exhibits are grand jury material, subject to the secrecy required under Federal Rule of Criminal Procedure 6(e).

Indeed, a major flaw in defendant's argument is that just because an exhibit *is* presented to a grand jury, or *may* be, as defendant suggests here, does not cloak the material with secrecy or prompt the policy concerns animating such secrecy. As the D.C. Circuit has explained, "Rule 6(e) does not draw 'a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury.'" *Labow v. United States Dep't of Justice*, 831 F.3d 523, 529 (D.C. Cir. 2016) (quoting *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (quoting *SEC v. Dresser Indus. Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc))). Rather, "the 'touchstone' is whether the information sought would reveal something about the grand jury's identity, investigation, or deliberation," *id.,* and merely because information could be, or even was, presented to the grand jury does not trigger Rule 6(e) secrecy, without an affirmation

14

that the grand jury considered the information.  No such connection to grand jury consideration has been made by the government and, therefore, the speculative jeopardy to grand jury proceedings raised by defendant as a ground for sealing the Video Exhibits is unpersuasive.

Second, defendant seeks sealing of the Video Exhibits to protect a vaguely referenced "constitutionally protected interest ('Fundamental-Fairness')," Def.'s Mot. Seal at 2, and to avoid "a reasonable likelihood of substantial prejudice," *id*.  The fourth *Hubbard* factor is designed to focus on the objecting party's privacy interest in the particular material at issue, and disclosure is discouraged where there is a possibility of "public humiliation and degradation" that would "constitute an unconscionable invasion of privacy" to innocent third persons.  *In re Appl. Nat'l Broad. Co.*, 653 F.2d at 620.  This is simply not the situation here since defendant wisely posits no privacy interests in the Video Exhibits themselves, and could not do so since the images of defendant were captured while he was participating very publicly with a mob assaulting the Capitol.

Defendant's central argument that disclosure of the Video Exhibits would result in a "reasonable likelihood of substantial prejudice" against defendant implicates the fifth *Hubbard* factor.  *See* Def.'s Mot. Seal at 2.  "[T]the possibility of prejudice to the defendant[] by sensational disclosure is a factor which may weigh in favor of denying immediate public access." *Hubbard*, 650 F.2d at 320–21.  Here, however, defendant simply does not specify what prejudice may result from disclosure that does not already arise from the fact that two of the video exhibits, Video Exhibits 4 and 5, are already publicly available online and the obvious circumstance that he has been charged with serious felony violations, based on alleged offense conduct described in detail in publicly filed documents, including the criminal complaint and the government's briefs in support of pretrial detention.  Further disclosures of his actual offense

conduct as it occurred and captured on all five Video Exhibits may focus more attention on that conduct and possibly exacerbate that prejudice, but not to an extent that overcomes the presumption of public access.[4]

### 6. Purpose for Which Video Exhibits Were Introduced

Finally, there is a "strong presumption of public access to documents that a litigant submits with the intention that the court will rely on them." *United States v. All Assets Held at Bank Julius Baer & Co.*, No. 04-cv-798 (PLF/GMH), 2020 U.S. Dist. LEXIS 244031, at *31 (D.D.C. Dec. 30, 2020).  As the Video Exhibits were introduced for the Court's consideration on the matter of detaining defendant, the final factor weighs heavily in favor of disclosure.  See *In re Appl. Nat'l Broad. Co.*, 653 F.2d at 620 ("conclud[ing] that the district court abused its discretion when it denied the broadcasters' post-trial application to inspect and copy the video and audio tapes introduced into evidence and played to the jury in the criminal trial").  There are exceptions to "the right to inspect and copy judicial records . . . where court files might have become a vehicle for improper purposes . . . such as to 'gratify private spite or promote public scandal . . .'" *Nixon*, 435 U.S. at 597 (quoting *In re Caswell*, 18 R.I. 835, 836 (1893)), but defendant has made no claim, nor has government given the Court reason to believe, that the Video Exhibits were introduced for any improper purpose.

Taken together, the presumption of access and additional interests supporting the media request weigh heavily in favor of granting access to the Video Exhibits.  The countervailing interests, most notably the risk of prejudice to the defendant, are simply insufficient to justify shielding the exhibits from public scrutiny.

---

[4]     While not mentioned by defendant, any concern about potential taint of the jury pool by allowing public access to the Video Exhibits may be dismissed as premature, given that no trial date has been set and may be many months away, if no disposition short of trial is reached, and also because alternative remedies exist to ensure that defendant receives a fair trial, including a rigorous *voir dire*.

**III.     ORDER**

For the foregoing reasons, defendant has not overcome the strong presumption in favor of

public access to the exhibits.  Accordingly, it is hereby

**ORDERED** that defendant's Motion to Seal, ECF No. 19, is DENIED; and it is further

**ORDERED** that the government promptly provide Scott MacFarlane of NBC

Washington News with Video Exhibits 1–5 submitted in tandem with the government's

Memorandum in Opposition to Defendant's Motion for Review and Revocation of a Detention

Order, ECF No. 14.

**SO ORDERED.**


Date: March 17, 2021


_____<br>
BERYL A. HOWELL<br>
Chief Judge